# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARINE WHOLESALE & WAREHOUSE CO.,

             Plaintiff,

             v.

UNITED STATES OF AMERICA, *et al.*,

             Defendants.

Civil Action No. 17-1300 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Marine Wholesale & Warehouse Co. ("MWW"), has filed a three-count complaint against defendants the United States of America, the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), and John J. Manfreda, in his official capacity as Administrator of the TTB, seeking "a declaratory judgment concerning whether MWW's TTB Tobacco Export Warehouse Proprietor's Permit, Alcohol Importer's Basic Permit, and Alcohol Wholesaler's Basic Permit automatically terminated in January 2013, and whether TTB properly warned MWW that continued operation of its facilities could lead to imposition of civil and criminal penalties." Am. Compl. ¶ 13, ECF No. 9.[1] The defendants have moved to dismiss the complaint based on lack of subject-matter jurisdiction, failure to state a claim upon which relief can be granted, and insufficient service of process. *See* Defs.' Mot. Dismiss ("Defs.' Mot.") at 1, ECF No. 14. For the reasons described below, this Court lacks subject-matter jurisdiction over the plaintiff's claims and, accordingly, the defendants' motion is granted.

---

[1]     The TTB was formed in 2003 when certain functions of the Bureau of Alcohol, Tobacco, and Firearms were transferred from the Department of the Treasury to the Department of Justice. *See* Homeland Security Act of 2002 § 1111, Pub. L. No. 107-296, 116 Stat. 2135, 2274.

# I. BACKGROUND

The statutory framework governing the relevant permits is discussed first, followed by the details of the plaintiff's claims and the relevant litigation history in both this Court and the D.C. Circuit.

## A. Statutory Framework

MWW's claims involve two types of permits: a tobacco export warehouse proprietor permit, issued under Title 26, Chapter 52 of the U.S. Code ("tobacco permit"), and basic permits for the importing and wholesaling of beverage alcohol, issued under the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 201 *et seq.* ("alcohol permits"). Am. Compl. ¶ 13.

### 1. *Tobacco Export Warehouse Proprietor Permits*

The tobacco permits are regulated under the Internal Revenue Code, which imposes on manufacturers and importers of tobacco products an excise tax on the domestic sale of such products. 26 U.S.C. § 5703(a)(1). Certain federal tax exemptions are available, including for an export warehouse proprietor, which is defined as "any person who operates" a "warehouse for the storage of tobacco products or cigarette papers or tubes or any processed tobacco, upon which the internal revenue tax has not been paid, for subsequent shipment to a foreign country . . . or for consumption beyond the jurisdiction of the internal revenue laws of the United States." *Id.* § 5702(h)–(i). Export warehouse proprietors must operate with valid permits issued by the TTB. *Id.* §§ 5712–13. Without valid permits, export warehouse proprietors are liable for the unpaid excise taxes and penalties that would otherwise apply to the importation of such products. *See id.* §§ 5703(a)(2), 5704(b)–(d), 5761(c).

Export warehouse proprietors must apply for such permits "before commencing business as a manufacturer or importer of tobacco products or processed tobacco or as an export warehouse proprietor, and at such other time as the Secretary [of the Treasury] shall by

regulation prescribe." *Id.* § 5712. Pursuant to that authority, the TTB promulgated a regulation requiring export warehouse proprietors to submit new applications after certain changes in their stockholders and corporate ownership. Specifically, the pertinent regulation provides as follows:

> Where the issuance, sale, or transfer of the stock of a corporation, operating as an export warehouse proprietor, results in a change in the identity of the principal stockholders exercising actual or legal control of the operations of the corporation, the corporate proprietor shall, within 30 days after the change occurs, make application for a new permit; otherwise, the present permit shall be automatically terminated at the expiration of such 30-day period . . . . If the application for a new permit is timely made, the present permit shall continue in effect pending final action with respect to such application.

27 C.F.R. § 44.107. Thus, if a permittee fails to notify the TTB of a change in "actual or legal control of the operations of the corporation," the permit automatically terminates by operation of law "within 30 days after the change occurs," and the permittee must submit an application for a new permit to continue operating as an export warehouse proprietor. *Id.* New permit applications "may be rejected and the permit denied if the Secretary, after notice and opportunity for hearing, finds that" certain conditions are present. 26 U.S.C. § 5712.[2] In addition, the TTB may suspend or revoke permits and may also order permit holders to show cause why their permits should not be suspended or revoked. *Id.* § 5713(b).

While the relevant TTB regulation "does not expressly provide for judicial review of a denied new permit application, the Internal Revenue Code authorizes refund actions." *Gulf Coast Maritime Supply, Inc. v. United States* ("*Gulf Coast II*"), 867 F.3d 123, 126 (D.C. Cir. 2017) (citing 26 U.S.C. § 7422). Such actions may be pursued only after "a claim for refund or credit has been duly filed with the Secretary" of the Treasury. 26 U.S.C. § 7422(a). Refund

---

[2] These conditions occur when (1) "the premises on which it is proposed to conduct the business are not adequate to protect the revenue"; (2) "the activity proposed to be carried out at such premises does not meet such minimum capacity or activity requirements as the Secretary may prescribe"; or (3) the applicant or any other officer, director, principal stockholder, or partner is "not likely to maintain operations in compliance with this chapter," "has been convicted of a felony violation . . . relating to tobacco products," or "has failed to disclose any material information required or made any material false statement in the application therefor." 26 U.S.C. § 5712(1)–(3).

actions include not only claims regarding tax liability but also "issues that 'hinge[ ] on precisely' whether one is liable for taxes—such as an entity's entitlement to tax-exempt status." *Gulf Coast II*, 867 F.3d at 126 (alteration in original) (quoting *Alexander v. "Americans United," Inc.*, 416 U.S. 752, 762 (1974)).

### 2. *Basic Permits for Importing and Wholesaling Beverage Alcohol*

Permits issued by the TTB are also required in order to import or purchase alcoholic beverages for sale. *See* 27 U.S.C. §§ 203–04; 27 C.F.R. §§ 1.20–25. Unlike the tobacco permits, alcohol permits are not connected to tax exemptions. *See generally* 27 U.S.C. § 204(a). An alcohol permit may, "by order of the Secretary of the Treasury, after due notice and opportunity for hearing to the permittee," be "revoked," "suspended," or "annulled" in certain circumstances. *See id.* § 204(e).[3] Alcohol permits "shall continue in effect until suspended, revoked, or annulled" as provided in that subsection. *Id.* § 204(g). In addition, like tobacco permits, alcohol permits automatically terminate upon the occurrence of certain conditions. Specifically, § 204(g) provides that:

> (1) if leased, sold, or otherwise voluntarily transferred, the permit shall be automatically terminated thereupon, and (2) if transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person, then such permit shall be automatically terminated at the expiration of thirty days thereafter: *Provided*, That if within such thirty-day period application for a new basic permit is made by the transferee or permittee, respectively, then the outstanding basic permit shall continue in effect until such application is finally acted on by the Secretary of the Treasury.

---

[3]    Specifically, a basic permit may (1) "be revoked, or suspended . . . , if the Secretary finds that the permittee has willfully violated any of the conditions thereof, provided that for a first violation of the conditions thereof the permit shall be subject to suspension only"; (2) "be revoked if the Secretary finds that the permittee has not engaged in the operations authorized by the permit for a period of more than two years"; or (3) "be annulled if the Secretary finds that the permit was procured through fraud, or misrepresentation, or concealment of material fact." 27 U.S.C. § 204(e).

*Id.* (emphasis in original).  Notice and an opportunity for hearing are not required before the automatic termination of an alcohol permit; rather, a permittee may file an application for a new permit within thirty days of the change and await the Secretary's action on that new application.  *Id.*

Section 204 also specifies the availability of and procedures for judicial review.  If an application for a new permit is denied, or if a permit is suspended, revoked, or annulled, "the permittee or applicant for a permit" may appeal that decision by filing, within sixty days of the Secretary's order, "a written petition praying that the order of the Secretary be modified or set aside in whole or in part."  *Id.* § 204(h).  Such petition must be filed "in the court of appeals of the United States within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia."  *Id.*  The statute specifies that, "[u]pon the filing of such petition such court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part."  *Id.*

### 3.  *Judicial Review*

These statutory schemes recognize that the purpose of such permits is to "exclude undesirable persons from holding permits," *Mid-Valley Distilling Corp. v. Decarlo*, 161 F.2d 485, 488 (3d Cir. 1947) (discussing basic alcohol permits), by ensuring that the agencies know the identities of the individuals exercising actual or legal control over the permitted entities.  Thus, as the D.C. Circuit has explained, these statutes and regulations "require[ ] full disclosure and good faith on the part of applicants for such privileges."  *Middlesboro Liquor & Wine Co. v. Berkshire*, 133 F.2d 39, 41 (D.C. Cir. 1942).  To this end, "[a]s to both alcohol and tobacco permits, the law establishes a process to ensure" that the TTB is "updated of any ownership changes," that a permit will "automatically terminate when an unreported ownership change occurs," and that a permittee may "seamlessly continu[e] operation, despite ownership changes," by timely submitting a new application reflecting the change in ownership.  *Gulf Coast II*, 867

F.3d at 126. In addition, "[j]udicial review is available if a new permit is denied—a refund suit in the tobacco permit context, and an appeal to a circuit court in the alcohol permit context—and that review may include considering whether it was necessary to update TTB as to a change in ownership." *Id.* If a permittee fails to comply with these requirements, then "[u]nder both the tobacco and alcohol permit schemes, automatic termination is a distinctive means by which a permit ceases to operate." *Id.* at 127. Indeed, "[b]oth statutory frameworks reflect this, treating the automatic termination process separately from the process afforded to other forms of cessation." *Id.* With this background in mind, the plaintiff's permits are examined next.

## B. The Plaintiff's Permits

The plaintiff is a family-owned S-corporation based in San Pedro, California, that operated a warehouse where it received untaxed tobacco and alcohol products and sold such products to commercial vessels for consumption while at sea. Am. Compl. ¶¶ 15–16, 24. MWW was first issued an export warehouse permit in 1961, and between 1961 and 1992, MWW properly reported changes to its corporate officers and owners to the TTB. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 5, ECF No. 14.[4]

In March 2001, MWW underwent a compliance inspection conducted by the TTB's predecessor agency, the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Defs.' Mot., Ex. A, Letter from Roger L. Bowling to Robert L. Hartry, dated February 12, 2002 ("February 2002 Letter") at 1, ECF No. 14-1. During this inspection, the ATF discovered an "unreported change in stock control that occurred on December 29, 1992." *Id.* Accordingly, on July 6, 2001, MWW President Robert L. Hartry informed the ATF of MWW's current stock ownership and applied for a new tobacco permit. Defs.' Mot., Ex. B, Letter from Robert L. Hartry to ATF, dated July 6,

---

[4] For ease of reference, cited page numbers refer to the ECF page numbers given on the top of each document.

2001 ("2001 Tobacco Permit App.") at 1–4, ECF No. 14-2.  This letter stated that Robert L.

Hartry owned 804 shares, or 80.4 percent, of MWW; his son Eric M. Hartry owned 146 shares, or

14.6 percent; and his son Robert H. Hartry owned 50 shares, or 5 percent.  *Id.* at 1; *see also* Am.

Compl. ¶ 18.  On the application, Robert L. Hartry agreed that he would "operate in conformity

with the applicable provisions of 26 U.S.C. Chapter 52, and all applicable regulations made

pursuant to law which are now, or may hereafter be, in force."  2001 Tobacco Permit App. at 3.

Similarly, on September 17, 2001, Robert L. Hartry submitted an application for new alcohol

permits, citing "change in ownership" as the reason for the application and stating the same stock

ownership listed in the 2001 Tobacco Permit Application.  Defs.' Mot., Ex. C, Applications for

Basic Permits under the Federal Alcohol Administration Act ("2001 Alcohol Permit Apps.") at

1–2, ECF No. 14-3.  In this permit application, Robert L. Hartry attested, under penalty of

perjury, that he would "immediately notify the ATF official with whom this application is filed

of any change in ownership, management, or control of the applicant *(in the case of a corporation,*

*any change in the officers, directors, or persons holding 10 percent or more of the corporate*

*stock)*."  *Id.* at 2 (emphasis in original).

The 2001 Tobacco Permit Application was granted on February 12, 2002.  *See* Defs.'

Mot., Ex. D, Export Warehouse Proprietor Permit No. EW-CA-5 ("Tobacco Permit") at 1, ECF

No. 14-4.  This permit states on its face that it "will remain in effect on condition that you comply

with the applicable provisions of 26 U.S.C. Chapter 52, the Federal Water Pollution Control Act,

and all applicable regulations made pursuant to law which now or may hereafter be, inforce, and

until suspended, revoked, automatically terminated, or voluntarily surrendered, as provided by

law and regulations."  *Id.*  The permit further states that "*[t]his permit is not transferable*.  Any

change in name, address, ownership, or control must be immediately reported to the District

Director, Bureau of Alcohol, Tobacco and Firearms." *Id.* (emphasis in original). In the cover letter transmitting the Tobacco Permit, the ATF informed Robert L. Hartry that MWW had "been operating without a valid ATF permit" and reminded him that "any future changes that could affect the validity of this permit should be reported in a timely manner." February 2002 Letter at 1–2.

The 2001 Alcohol Permit Applications were granted on November 6, 2001. *See* Defs.' Mot., Ex. E, Basic Permit Nos. CA-I-4940 & CA-P-8736 ("Alcohol Permits") at 1–2, ECF No. 14-5. These permits specify that they are "conditioned upon your compliance with the Federal Alcohol Administration Act" and "all applicable regulations made pursuant to law which are now, or may hereafter be, in force," among other laws. *Id.* In addition, the alcohol permits state that they "WILL AUTOMATICALLY TERMINATE THIRTY DAYS AFTER ANY CHANGE IN PROPRIETORSHIP OR CONTROL OF THE BUSINESS, unless an application for a new basic permit is made by the transferee or permittee within the thirty day period." *Id.* (capitalization in original). If such an application is filed, "the outstanding basic permit will continue in effect until the application is acted on" by the ATF. *Id.* An additional, capitalized paragraph further specifies that:

> THIS PERMIT IS NOT TRANSFERABLE. ANY CHANGE IN THE TRADE NAME, CORPORATE NAME, MANAGEMENT OR ADDRESS OF THE BUSINESS COVERED BY THIS PERMIT, OR ANY CHANGE IN STOCK OWNERSHIP (MORE THAN 10%) MUST BE REPORTED TO THE REGIONAL DIRECTOR (COMPLIANCE) WITHOUT DELAY.

*Id.*

On or about December 31, 2012, Robert L. Hartry "transferred a percentage of MWW shares such that, after the transfer, the shareholdings were as follows: Robert L. Hartry, 45.4%; Robert H. Hartry, and Eric M. Hartry, his sons, 25% and 14.6%, respectively; and Mr. Jerry Anderson, 15%." Am. Compl. ¶ 20. Anderson is not a member of the Hartry family. *Id.* Robert

L. Hartry's share thus decreased from 80.4 percent to 45.4 percent, a change of 35 percentage points; Robert H. Hartry's share increased from 5 percent to 25 percent, a change of 20 percentage points; Eric M. Hartry's share remain unchanged; and Jerry Anderson became a new shareholder. *Id.* ¶¶ 18, 20. According to the defendants, MWW never informed the TTB of this change in ownership. *See* Defs.' Mem. at 9; Defs.' Mot., Ex. F, Email from Robert Targ (MWW) to Stacy Houston (TTB), dated Nov. 18, 2015 ("Nov. 18, 2015 Email") at 1, ECF No. 14-6 (informing the TTB, in response to request for proof that documentation of this ownership change was submitted to the TTB, that "I have verified Marine Wholesale & Warehouse Co. did not previously submit the Minutes Of Special Meeting Of Board Of Directors to TTB"). Notably, MWW does not contend that it informed the TTB of this change. *See generally* Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 17. Instead, MWW claims that "[c]ontrol of MWW has not been acquired by a new stockholder or in any other manner," that "[t]he transfer of MWW stock did not result in a change in the identity of the principal stockholders exercising control over MWW," and that "[t]he Hartry family, as a single shareholder, retains 85% of the stock, and Mr. [Robert L.] Hartry continues to serve as president." Am. Compl. ¶¶ 33, 35.

In early 2015, the TTB performed another inspection of MWW and learned, for the first time, of the 2012 change in ownership. Defs.' Mem. at 9. On March 31, 2017, the TTB sent MWW a Notice to Cease and Desist, stating that the TTB "has reason to believe that, based on an unreported change in control occurring on December 15, 2012, [MWW] has been engaging in business as an Export Warehouse Proprietor without the required permit issued under the Internal Revenue Code" and has also been "engaging in the business of wholesaling and/or importing beverage alcohol without valid Federal Alcohol Administration Act" permits. Am. Compl., Ex. A, Notice to Cease and Desist ("Cease & Desist Letter") at 19, ECF No. 9. The TTB warned

MWW that "such activities violate federal law" and that "[c]ontinued operation without the required permits subjects [MWW] to potential civil and/or criminal penalties." *Id.* After recounting the applicable regulations and statutes governing the Tobacco and Alcohol Permits, *see* 27 C.F.R. §§ 1.44, 44.107; 27 U.S.C. § 204(g), the TTB stated that MWW's "failure to comply with the statutory and regulatory requirements outlined above resulted in the automatic termination" of MWW's Tobacco and Alcohol Permits, Cease & Desist Letter at 20. The TTB further advised MWW that, due to the lack of those required permits, MWW "is not authorized to engage in any of the activities authorized by those permits" and that "[c]ontinued operations as such subjects [MWW] to all applicable" criminal and civil penalties. Cease & Desist Letter at 20. MWW "voluntarily ceased activities" at its warehouse "while it challenged the agency's determination that its permit[s] had been automatically terminated." Pl.'s Opp'n at 2 n.1.

### C. Litigation History

On May 30, 2017, MWW filed a Petition for Review of the alleged revocation of the Tobacco and Alcohol Permits in the United States Court of Appeals for the District of Columbia Circuit. *See Marine Wholesale & Warehouse Co. v. Dep't of Treasury Alcohol & Tobacco Tax & Trade Bur.*, No. 17-1140 (D.C. Cir. filed May 30, 2017). That proceeding was held in abeyance pending the D.C. Circuit's resolution of another case involving similar issues. *See id.*, Order (D.C. Cir. filed July 19, 2017). In that similar case, *Gulf Coast II*, the plaintiff had the same permits as MWW—a tobacco export warehouse permit and separate permits to import and wholesale beverage alcohol. *Gulf Coast II*, 867 F.3d at 125. Gulf Coast failed to inform the TTB of an ownership change when its President passed away and his widow received all of his shares. *Id.* For reasons described more fully *infra*, Part III.A, the D.C. Circuit concluded that the Anti-Injunction Act "prohibits Gulf Coast's attempt to restore its terminated tobacco permit" and

that the district court "lacked jurisdiction over Gulf Coast's alcohol permit claim." *Gulf Coast II*, 867 F.3d at 125.

After the D.C. Circuit resolved *Gulf Coast II*, the government moved to dismiss MWW's petition based on a lack of jurisdiction. *See Marine Wholesale & Warehouse*, No. 17-1140, Respondent's Mot. Govern Further Proceedings at 1–2 (D.C. Cir. filed Sept. 11, 2017). MWW failed to respond to that motion and also failed to respond to the D.C. Circuit's Order to Show Cause why the action "should not be considered and decided without a response." *Marine Wholesale &Warehouse*, No. 17-1140, Order (D.C. Cir. filed Sept. 25, 2017); *see also Marine Wholesale & Warehouse*, No. 17-1140, Order (D.C. Cir. filed Oct. 31, 2017) ("D.C. Circuit Final Order"). MWW's action in the D.C. Circuit was, accordingly, dismissed for lack of prosecution. *See* D.C. Circuit Final Order.

Meanwhile, MWW filed the instant complaint in this Court on June 30, 2017, one month after filing its petition for review in the D.C. Circuit. *See generally* Compl., ECF No. 1. On October 2, 2017, MWW was ordered by this Court to show cause why this case should not be dismissed for failure to prosecute based on the plaintiff's failure to offer proof that the defendants had been properly served within ninety days of filing the complaint. *See* Minute Order (Oct. 2, 2017). MWW responded by submitting return receipts for delivery of the complaint, via certified mail, to the "Atty. General of the United States" and "USA c/o Ronald C. Machen, Jr., Esq. US Attorney" on June 12, 2017—eighteen days before the complaint was filed. *See* Pl.'s Resp. Order Show Cause & Mot. Leave Submit Proof of Service Out of Time ("Pl.'s First OSC Resp.") at 9, ECF No. 6. MWW then filed an amended complaint on October 24, 2017. *See generally* Am. Compl.

On January 2, 2018, after no answer or other response to the amended complaint had been filed and no notice of appearance had been entered by the defendants, MWW was again ordered to show cause why the case should not be dismissed for failure to prosecute. *See* Minute Order (Jan. 2, 2018). MWW responded by submitting return receipts for delivery, via certified mail, of the amended complaint to the same recipients, dated October 30, 2017. Pl.'s Resp. Order Show Cause & Mot. Leave Submit Proof of Service Out of Time ("Pl.'s Second OSC Resp.") at 7, ECF No. 10. MWW averred that it was "unaware as to why the defendant has not responded to the Complaint" and that the defendants were "aware of plaintiff's dispute." *Id.* at 3.

On the same day, the defendants entered an appearance and filed a Notice Regarding Service of Complaint and Summons ("Defs.' Notice"), ECF No. 12. The defendants noted that "the United States Attorney's Office did not receive valid service of process" as required by Federal Rule of Civil Procedure 4(i)(1)(A)(ii) but nevertheless stated that, "to avoid further delay and the administrative inconvenience of requiring Plaintiff to properly serve the Summons and Amended Complaint, Defendants will file an answer or motion to dismiss by January 31, 2018." *Id.* at 2–3. The defendants promptly filed the pending motion to dismiss, alleging a lack of subject-matter jurisdiction, failure to state a claim upon which relief can be granted, and insufficient service of process. *See* Defs.' Mot. at 1.

## II.     LEGAL STANDARD

### A.     Lack of Subject-Matter Jurisdiction under Rule 12(b)(1)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over its claim by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by

Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)). Absent subject-matter jurisdiction, the court must dismiss the case. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006); Fed. R. Civ. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating subject-matter jurisdiction, the court may look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert*, 974 F.2d at 197.

**B.** **Insufficient Service of Process under Rule 12(b)(5)**

The law is well settled that "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural

imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). This is because service is necessary, but not sufficient, to allow a court to exercise personal jurisdiction over a defendant. *See Mwani v. bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005) (noting that "service of process does not alone establish personal jurisdiction"). Indeed, "'[b]efore a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant.' There also must be 'authorization for service of summons on the defendant,' and a 'constitutionally sufficient relationship between the defendant and the forum.'" *Id.* (citation omitted; alteration in original) (quoting *Omni Capital*, 484 U.S. at 104).

When sufficiency of service is challenged, the burden is on the plaintiff to demonstrate that service has been properly effected. *See Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (noting under Federal Rule of Civil Procedure 4 that "the plaintiff has the burden to demonstrate that the procedure employed to deliver the papers satisfies the requirements" of proper service) (internal quotation marks omitted); *see also* 4A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1083 (4th ed.) ("The party on whose behalf service of process is made has the burden of establishing its validity when challenged; to do so, she must demonstrate that the procedure employed to deliver the papers satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law."). Insufficient service of process on a defendant "warrant[s] the court's dismissing [the plaintiff's claims] without prejudice" under Federal Rule of Civil Procedure 12(b)(5). *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997).

## C. Failure to State a Claim under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content

that is more than "'merely consistent with' a defendant's liability" and that "allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v.*

*Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not

required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and

conclusions" or a "formulaic recitation of the elements of a cause of action" to provide "grounds"

of "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original; internal quotation

marks omitted), and must "nudge[ ] the[ ] claims across the line from conceivable to plausible,"

*id*. at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of

'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be

granted, the court must consider the complaint in its entirety, accepting all factual allegations in

the complaint as true, even if doubtful in fact.  *Twombly*, 550 U.S. at 555; *Sissel v. U.S. Dep't of*

*Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014) (noting that in considering a Rule

12(b)(6) motion, the "court assumes the truth of all well-pleaded factual allegations in the

complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but

is not required to accept the plaintiff's legal conclusions as correct") (citation omitted).  In

addition, courts may "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions

to dismiss, in particular, documents incorporated into the complaint by reference, and matters of

which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 322 (2007); *see also English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

## III. DISCUSSION

The defendants have moved to dismiss the complaint on three grounds: lack of subject-matter jurisdiction, failure to state a claim upon which relief can be granted, and insufficient service of process. *See* Defs.' Mem. at 12–28. These claims are addressed in turn.

### A. The Amended Complaint Must Be Dismissed for Lack of Subject-Matter Jurisdiction

The defendants contend that the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), deprives the Court of jurisdiction to adjudicate claims regarding the tobacco permit, *see* Defs.' Mem. at 12–15, and that the adequate alternative remedy set forth in the FAAA deprives the Court of jurisdiction to adjudicate claims regarding the alcohol permits, *see id.* at 15–20. The plaintiff, in turn, avers that the AIA is not implicated in this case, Pl.'s Opp'n at 11–13, and that the Court has jurisdiction to "entertain an action seeking review of a final agency determination that an automatic termination had occurred," *id.* at 7. The plaintiff is wrong on both counts. As the D.C. Circuit explained in *Gulf Coast II*, a case that controls this dispute, the AIA and the FAAA bar the adjudication of the plaintiff's claims and, accordingly, the amended complaint must be dismissed for lack of subject-matter jurisdiction.

### 1. The AIA Bars Adjudication of Claims Regarding the Plaintiff's Tobacco Permits

The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a); *see also Maze v. IRS*, 862 F.3d 1087, 1091 (D.C. Cir. 2017). As the Supreme Court has explained, the "manifest purpose" of the AIA "is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 543 (2012) ("This statute

protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes."); *Gulf Coast II*, 867 F.3d at 128–29 (quoting *NFIB*, 567 U.S. at 543). Accordingly, "[a] claim that comes within the AIA's scope must be dismissed for lack of subject matter jurisdiction." *Maze*, 862 F.3d at 1091; *see also Z St. v. Koskinen*, 791 F.3d 24, 29 (D.C. Cir. 2015). The AIA does not apply, however "where the plaintiff has no other remedy for its alleged injury," *Z St.*, 791 F.3d at 31, because "the Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims," *id.* at 29 (quoting *South Carolina v. Regan*, 465 U.S. 367, 381 (1984)).

To determine whether a suit falls within the scope of the AIA, courts must "engage in 'a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection.'" *Maze*, 862 F.3d at 1091 (quoting *Cohen v. United States*, 650 F.3d 717, 724, 727 (D.C. Cir. 2011) (en banc)). Importantly, the plaintiff in such a case "is not free 'to define the relief it seeks in terms permitted by the Anti-Injunction Act' while 'ignor[ing] the ultimate deleterious effect such relief would have on the Government's taxing ability.'" *Int'l Lotto Fund v. Va. State Lottery Dep't*, 20 F.3d 589, 591 (4th Cir. 1994) (quoting *Educo, Inc. v. Alexander*, 557 F.2d 617, 620 (7th Cir. 1977)). Nor can a plaintiff "evade the Anti-Injunction Act by purporting to challenge only the regulatory aspect of a regulatory tax." *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1070 (D.C. Cir. 2015).

As the plaintiff acknowledges, the D.C. Circuit recently held that "the AIA prohibits [a permittee's] attempt to restore its terminated tobacco permit." *Gulf Coast II*, 867 F.3d at 125; *see also* Pl.'s Opp'n at 6 ("It is true, as defendant indicates, that in *Gulf Coast [II]*, the Circuit Court held than [sic] action challenging revocation of such permits was barred by the [AIA], as the necessary consequence of a decision to set aside revocation of a license or permit, in the

circumstances, would be restoration of the permits, a remedy which would block any tax assessments."). In *Gulf Coast II*, the permittee operated a tobacco export warehouse and imported and sold beverage alcohol products at the same location, pursuant to the same types of TTB permits that are at issue in this case. *Gulf Coast II*, 867 F.3d at 127. Gulf Coast's owner and president, Sam Geller, and his wife, Barbara Geller, each owned 45 percent of Gulf Coast's shares. *Id.* Following Mr. Geller's death in August 2013, Ms. Geller reached a partition agreement with Mr. Geller's estate and obtained ownership of Mr. Geller's shares. *Id.* This change in stock ownership was never reported to the TTB. *Id.* Thus, after learning of this change in ownership in April 2016, the TTB sent Gulf Coast a letter informing Gulf Coast that its permits "had terminated automatically by operation of law in 2013, and continued operation would be taxable and potentially subject to civil or criminal penalties." *Gulf Coast Maritime Supply, Inc. v. United States* ("*Gulf Coast I*"), 218 F. Supp. 3d 92, 95 (D.D.C. 2016), *aff'd*, 867 F.3d 123 (D.C. Cir. 2017). Gulf Coast then initiated an action in district court, arguing that "TTB failed to provide sufficient notice and procedures before terminating the permits" and seeking "a preliminary injunction to preserve the status quo, which in its perspective means continued operation under its now-terminated permits." *Id.* at 96.

Gulf Coast essentially sought to "retroactively restore its tobacco permit," which had terminated by operation of law by virtue of the unreported stock transfer. *Gulf Coast II*, 867 F.3d at 129 (internal quotation marks omitted). MWW seeks functionally equivalent relief here.[5]

---

[5] MWW's original complaint sought an injunction preventing the TTB "from suspending or revoking" MWW's permits, Compl. at 18, but MWW amended the complaint after the D.C. Circuit's decision in *Gulf Coast II* to seek only declaratory, rather than declaratory and injunctive, relief, *see* Am. Compl. at 15–16. This change does not affect application of the AIA. The D.C. Circuit has concluded that "the Declaratory Judgment Act is coterminous with the AIA, meaning that the AIA decides this case." *Maze*, 862 F.3d at 1091 n.4 (internal quotation marks omitted); *see also Fla. Bankers*, 799 F.3d at 1067. Nor does MWW's request for an order "[d]eclaring the automatic termination of plaintiff's permits to constitute an excessive fine in contravention of Amendment 8 of the United States Constitution," Am. Compl. at 16—an argument asserted only in the amended complaint and not in the plaintiff's briefing on the pending motion to dismiss—escape the AIA. Supreme Court decisions "'make it

Although MWW does not seek an injunction, the company does seek "an order . . . [d]eclaring unlawful and setting aside TTB's March 31, 2017 letter which asserted the automatic termination of MWW's export warehouse proprietor's permit no. EW-CA-5, alcohol importer's basic permit no. CA-I-4940, and alcohol wholesaler's basic permit no. CA-P-8736," as well as "[d]eclaring the automatic termination of plaintiff's permits to constitute an excessive fine in contravention of Amendment 8 of the United States Constitution." Am. Compl. at 15–16. Such an order would affect MWW's tax liability and would "void[ ] *ab initio* any unpaid excise taxes on tobacco sales made during the period where [MWW] operated under its terminated permit." *Gulf Coast II*, 867 F.3d at 129. Thus, "[n]o matter how Plaintiff articulates its claim—whether it is a direct challenge to its tax liability or a request to have its permits restored—'the effect of [ruling in the plaintiff's favor] here is to interfere with the assessment or collection of a tax.'" *Gulf Coast I*, 218 F. Supp. 3d at 97 (quoting *Int'l Lotto Fund*, 20 F.3d at 591).

In addition, MWW has an alternative remedy to redress its alleged injury: as the D.C. Circuit has explained, "a refund suit challenging TTB's change-in-ownership finding *is* an 'alternative remedy'" for purposes of the AIA. *Gulf Coast II*, 867 F.3d at 130 n.1 (emphasis in original). MWW's "ability to initiate a refund suit—an adequate alternative avenue—means that the AIA applies with full force to [its] action." *Maze*, 862 F.3d at 1093 (internal quotation marks and citation omitted); *see also Fla. Bankers*, 799 F.3d at 1067 ("To be clear, our ruling does not prevent a [party] from obtaining judicial review of the challenged regulation. A [party] may decline to submit a required report, pay the penalty, and then sue for a refund. At that time, a court may consider the legality of the regulation.").

---

unmistakably clear that the constitutional nature of a taxpayer's claim . . . is of no consequence' to whether the prohibition against tax injunctions applies." *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 10 (2008) (alteration in original) (quoting *"Americans United"*, 416 U.S. at 759).

MWW attempts to distinguish *Gulf Coast II* on several grounds. First, MWW argues that *Gulf Coast II* is not binding because that case involved a revocation, rather than an automatic termination. *See* Pl.'s Opp'n at 12. In support of this argument, MWW relies on a footnote from *Gulf Coast II* in which the D.C. Circuit noted that "if an automatic termination can result in a restored permit after judicial review, then an 'automatic termination' is neither automatic nor a termination." *Gulf Coast II*, 867 F.3d at 130 n.1; *see also* Pl.'s Opp'n at 12–13. Rather than bolster MWW's position, however, this footnote provides an additional reason why judicial review of an automatic termination is "a *non sequitur*" and unavailable for automatically terminated permits. *Gulf Coast II*, 867 F.3d at 129; *see also* Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 3, ECF No. 20. Second, MWW contends that "a challenge to an agency's determination that an automatic termination occurred—the remedy sought here—does not implicate the AIA." Pl.'s Opp'n at 12. As explained above, however, a determination of whether MWW's permits automatically terminated necessarily affects the assessment or collection of taxes, thereby running afoul of the AIA. *See also Gulf Coast II*, 867 F.3d at 129–30. Accordingly, the AIA deprives the Court of subject-matter jurisdiction to adjudicate MWW's claims regarding its tobacco permits.

### 2. The FAAA Provides an Adequate Alternative Remedy for the Plaintiff's Alcohol Permits

Unlike the tobacco permits, MWW's alcohol permits "do[ ] not affect Marine Wholesale's tax liability." Defs.' Mem. at 15. Instead, jurisdiction over claims related to the alcohol permits is determined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* The APA permits judicial review of "final agency action[s] for which there is no other adequate remedy in a court," 5 U.S.C. § 704, but "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures," *Bowen*

*v. Mass.*, 487 U.S. 879, 903 (1988); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017) ("[W]here a special statutory review procedure exists, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." (alterations and internal quotation marks omitted)).

In this Circuit, "[a]n 'alternative remedy is adequate and therefore preclusive of APA review' if there is 'clear and convincing evidence of legislative intent to create a special, alternative remedy,' such as when Congress 'provide[s] . . . an alternative review procedure.'" *Gulf Coast II*, 867 F.3d at 131 (some internal quotation marks omitted; alterations in original) (quoting *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 846 F.3d 1235, 1244–45 (D.C. Cir. 2017)). The alternative remedy "need not provide relief identical to relief under the APA, so long as it offers relief of the same genre." *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (internal quotation marks omitted). "[W]here a statute affords an opportunity for *de novo* district-court review" of the agency action, APA review is precluded since "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA." *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (internal quotation marks omitted; alterations in original).

Although the D.C. Circuit held in *Gulf Coast II* that "the alcohol-permitting scheme set out in 27 U.S.C. § 204 takes the place of the APA's license-revocation procedures and provides its own process for judicial review," *Gulf Coast II*, 867 F.3d at 130, that opinion did not address the procedures for review of permits that had been automatically terminated, rather than revoked. Nonetheless, the result is the same. Section 204(g) specifies that an alcohol permit will "automatically terminate[ ] at the expiration of thirty days" after a permit is "transferred by

operation of law" or after a change in "actual or legal control of the permittee." 27 U.S.C.

§ 204(g). The permittee can temporarily avoid termination by filing an application for a new

basic permit within that thirty-day window, in which case "the outstanding basic permit shall

continue in effect until such application is finally acted on by the Secretary of the Treasury." *Id.*

In evaluating the new application, the Secretary will thus review the change in control to

determine whether a new permit should issue. Thus, "[n]othing can be done by this court to aid

plaintiff and its only hope of continuing in business lies in a successful termination of

proceedings in its application for new permits." *United Distillers Prods. Corp. v. Henneberry*

("*United Distillers I*"), 135 F. Supp. 37, 39 (D. Mass. 1955), *aff'd*, 243 F.2d 667 (D.C. Cir.

1957); *see also Gulf Coast I*, 218 F. Supp. 3d at 99 ("Upon such an automatic termination,

Plaintiff's only remedy would have been to seek a new permit within thirty days of the

termination, which would have allowed 'the outstanding basic permit[s] [to] continue in effect

until such application is finally acted on by the Secretary of the Treasury.'" (alterations in

original) (quoting 27 U.S.C. § 204(g))).

If, however, the Secretary erred in interpreting the effect of the stock transfer, "then the

letter to plaintiff erroneously informing it that its basic permits had automatically terminated,

even though not so designated, constituted an order suspending, revoking, or annulling the basic

permits." *United Distillers I*, 135 F. Supp. at 39 (internal quotation marks omitted). Judicial

review of such a decision is available in only the D.C. Circuit or the federal circuit court for the

jurisdiction in which the permittee resides or has its principal place of business. 27 U.S.C.

§ 204(h); *see also Gulf Coast I*, 218 F. Supp. 3d at 100 ("[E]ven if this court were to agree that

the April 14 letter constituted a revocation, then Plaintiff was required to bring its appeal,

including arguments about TTB's failure to provide required due process, to the U.S. Court of

Appeals within 60 days.").  Thus, in either situation, this Court lacks jurisdiction to resolve the plaintiff's claims.

The plaintiff nevertheless argues that *dicta* from the *Gulf Coast II* opinion indicates that "the court could entertain an action seeking review of a final agency determination that an automatic termination had occurred."  Pl.'s Opp'n at 7.  In *Gulf Coast II*, the plaintiff's alcohol permits automatically terminated, but the plaintiff "discard[ed] the difference between revocations and automatic terminations" and sought restoration of its permits rather than review of the automatic termination.  *Gulf Coast II*, 867 F.3d at 129.  The court plainly stated that Gulf Coast had "made no such argument" for review of the automatic termination "before us in response to the government's jurisdictional challenge," and "because the issue was not briefed, we do not decide it."  *Id.* at 132.

Nevertheless, the court reasoned that it "would be confronted with a different question . . . had Gulf Coast instead argued that it was challenging a determination by the agency that its permits had automatically terminated."  *Id.*  Citing two examples, the court noted that it had, in the past, "found final agency action and allowed parties to bring pre-enforcement challenges under somewhat similar circumstances."  *Id.*  First, the court noted that in *CSI Aviation Services, Inc. v. U.S. Department of Transportation*, 637 F.3d 408 (D.C. Cir. 2011), a letter sent by the Department of Transportation to a company warning that the plaintiff had been acting as an unauthorized indirect air carrier was reviewable because "it represented the agency's definitive position on the legality of the petitioner's actions and because the letter 'imposed an immediate and significant burden' on the petitioner by declaring its operations unlawful."  *Gulf Coast II*, 867 F.3d at 132 (quoting *CSI Aviation*, 637 F.3d at 412).  Similarly, in *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), a letter sent by the EPA to a company warning that failure to revise certain

pesticide labels would result in a misbranding action was reviewable because the letter "reflected the agency's definitive position on the lawfulness of the company's conduct and warned that failure to 'conform to the new labeling requirement' could subject the company to 'civil and criminal penalties.'" *Gulf Coast II*, 867 F.3d at 132 (quoting *Ciba-Geigy*, 801 F.2d at 433, 437).

After discussing these cases and analyzing the language in the TTB's letter to Gulf Coast, the D.C. Circuit concluded that "these cases *could be read* to suggest that Gulf Coast, had it proceeded differently, *might have been able* to bring an APA claim in district court to test the agency's determination that an ownership change occurred and that the permits had therefore automatically terminated." *Id.* (emphasis added). This language does not dictate the conclusion in this case, and indeed, case law both inside and outside this Circuit indicates that this *dicta* should not be followed in this case. In *United Distillers Products Corp. v. Henneberry* ("*United Distillers II*"), 243 F.2d 667 (D.C. Cir. 1957), which was neither discussed nor cited in *Gulf Coast II*, the plaintiff corporation sought review of a decision by the TTB's predecessor agency that its alcohol permits had terminated based on an unreported stock transfer. *Id.* at 668. The plaintiff contended that "the transfer of stock did not automatically terminate the existing permits" and sought restoration of such permits. *Id.* at 668–69. The D.C. Circuit saw no error in the agency's conclusion that an automatic termination had occurred, *id.* at 669, and affirmed the district court's conclusion that "[n]othing can be done by this court to aid plaintiff and its only hope of continuing in business lies in a successful termination of proceedings in its application for new permits," *United Distillers I*, 135 F. Supp. at 39. Other circuit courts have similarly held that automatic terminations are not reviewable by district courts. *See, e.g.*, *Buonocore v. Bur. Alcohol, Tobacco & Firearms*, 4 F. App'x 538, 2001 WL 180837, at *1 (9th Cir. Feb. 23, 2001) ("The Secretary of the Treasury did not issue an order 'denying an application for, or suspending,

revoking, or annulling, a basic permit.'  We therefore lack jurisdiction over Buonocore's petition.") (internal citation omitted).

In addition, the concurring opinion in *Gulf Coast II* presents strong arguments why the position urged by the plaintiff should not be adopted.  First, allowing APA review in these circumstances would duplicate the procedures set forth in the FAAA, which provide for judicial review of permit revocations but not for automatic terminations.  *Gulf Coast II*, 867 F.3d at 135 (Brown, J., concurring) (citing 27 U.S.C. § 204(e), (g)–(h)).  Indeed, "[s]ection 204 renders the denial of a new permit application—an application made in response to an automatically terminated permit—final agency action subject to judicial review."  *Id.* at 136 (citing 27 U.S.C. § 204(h)).  In this case, however, as in *Gulf Coast II*, deeming the TTB's letter a "final agency action would be an unjustifiable expansion of the APA's scope."  *Id.* (internal quotation marks omitted).  Here, "[t]he letter's content and purpose are merely advisory," reminding the permittee "of the consequences of operating with a terminated permit and without a new permit application" and "[i]nforming [the permittee] of extant facts," and accordingly, the letter "does not 'impose an obligation, deny a right, or fix some legal relationship.'"  *Id.* (alterations omitted) (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prods. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003)); *see also Mid-Valley Distilling*, 161 F.2d at 487 (concluding that it is "apparent that if the permits automatically terminated by reason of" a stock transfer, then a letter informing the plaintiff of the automatic termination of its alcohol permits "is not an order," but if the permits did not automatically terminate, then the plaintiff "will have to proceed as required by subsection [§ 204](e)").  Moreover, "the legal consequences (civil and criminal penalties) identified within the TTB letter are clearly understood to reference the consequences of operating without a valid alcohol permit, not the consequences of refusing to comply with the letter," which "disqualifies

the letter from constituting 'final agency action.'" *Gulf Coast II*, 867 F.3d at 136 (Brown, J., concurring) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

In addition, the concurrence notes that the FAAA sets out procedures to follow in the event of a change in control: the permittee may file an application for a new process, which application is reviewed by the TTB and the denial of which may be reviewed in court. *Id.* at 137. Although this "additional paperwork may seem cumbersome, [ ] it is also *de-minimis* when compared to the risk [of] not filing anything at all" after the change in control. *Id.* Finally, the concurrence emphasizes that the fact that a permittee "chose—and it was a choice—to not take advantage of the process Congress articulated does not make the process inadequate." *Id.* (citing *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990)). This reasoning is persuasive, and based on the procedures for judicial review of an automatic termination identified in § 204(g) and (h), the plaintiff may not bring its APA claim in district court. Nonetheless, even if review of the plaintiff's claims were available in this Court, the defendants' motion would be granted for the reasons next explained.

### B.    The Plaintiff's Complaint Fails to State a Claim upon which Relief Can Be Granted

The defendants argue that, even assuming the plaintiff's claims are reviewable in this Court, the undisputed facts show a change of actual or legal control that triggered the automatic termination of the plaintiff's permits, *see* Defs.' Mem. at 23–27; Defs.' Reply at 5–7. The plaintiff counters that no change in actual or legal control occurred. *See* Pl.'s Opp'n at 10–11. Again, the defendants are correct.

Under both the tobacco and the alcohol permitting schemes, permits automatically terminate upon a change in "actual or legal control" of the permittee. *See* 27 C.F.R. § 44.107 (stating that tobacco permits automatically terminate "[w]here the issuance, sale, or transfer of

the stock of a corporation, operating as an export warehouse proprietor, results in a change in the identity of the principal stockholders exercising actual or legal control of the operations of the corporation"); 27 U.S.C. § 204(g) (stating that alcohol permits automatically terminate "if transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person"). In addition, each of the permits at issue states, in clear terms, that the TTB must be notified of any changes in ownership or control. *See* Tobacco Permit at 1 ("*This permit is not transferable.* Any change in name, address, ownership, or control must be immediately reported to the District Director, Bureau of Alcohol, Tobacco and Firearms.") (emphasis in original); Alcohol Permits at 1–2 ("Any change in the trade name, corporate name, management or address of the business covered by this permit, or any change in stock ownership (more than 10%) must be reported to the regional director (compliance) without delay.") (capitalization omitted).

In this case, MWW's amended complaint makes clear that, "[p]rior to December 15, 2012, Robert L. Hartry [was] the principal shareholder of MWW, holding 80.4% of the shares of the corporation," and that "[t]he remaining shares were owned 5% by Robert H. Hartry, son of Robert L. Hartry, and 14.6% by Eric M. Hartry, son of Robert L. Hartry." Am. Compl. ¶ 18. MWW then states that, "[o]n or about December 31, 2012, Mr. [Robert L.] Hartry transferred a percentage of MWW shares such that, after the transfer, the shareholdings were as follows: Robert L. Hartry, 45.4%; Robert H. Hartry, and Eric M. Hartry, his sons, 25% and 14.6%, respectively; and Mr. Jerry Anderson, 15%." *Id.* ¶ 20. MWW does not allege that it reported this change—which changed Robert L. Hartry's ownership by nearly 40 percent, changed Robert H. Hartry's ownership by 20 percent, and added a new shareholder from outside the Hartry family—to the TTB. Thus, taking the facts stated in MWW's amended complaint as true, MWW's permits

terminated by operation of law when this transfer, resulting in a change of control and a new owner, was made, and accordingly no notice or opportunity for a hearing was required. *See* 27 U.S.C. § 204(e) (requiring "due notice and opportunity for hearing to the permittee" only for the revocation, suspension, or annulment of a permit but not for an automatic termination).

MWW nevertheless argues that "'actual or legal control' of MMW [sic] has not been acquired by any other person as a result of the 2012 share transfer transaction" and that "[t]he Hartry family, required to be treated as a single shareholder of the Subchapter S corporation which holds the permit, retained 85% of the shares of the company after the share transfer occurred." Pl.'s Opp'n at 11. MWW is an S-corporation and is correct that, under 26 U.S.C. § 1361(c)(1), "all members of a family"—which means "common ancestor, any lineal descendant of such common ancestor, and any spouse or former spouse of such common ancestor or any such lineal descendant," *id.* § 1361(c)(1)(B)(i)—shall be treated as one shareholder, *id.* § 1361(c)(1)(A)(ii). The fact that MWW is an S-corporation, however, does not mean that the shareholder-counting rules applicable to S-corporations also apply throughout the United States Code. Rather, § 1361(c)(1) applies only "[f]or purposes of subsection (b)(1)(A)," which defines a "small business corporation" as a "domestic corporation" with no more than 100 shareholders. *Id.* § 1361(b)(1)(A). Thus, the requirement in § 1361(c)(1) that family members be treated as a single shareholder applies only to § 1361(b)(1)(A), and does not extend to other sections of Subchapter S, let alone to the rest of Title 26 and Title 27 of the U.S. Code. Indeed, the D.C. Circuit has previously affirmed an order of the TTB's predecessor agency concluding that a transfer of shares from wife to husband "constitutes a change in the control and management of the business . . . necessitating the issuance of a new basic permit under the Federal Alcohol Act." *United Distillers II*, 243 F.2d at 668 (internal quotation marks omitted; alteration in original).

Even assuming, as the plaintiff argues, that Subchapter S of the Internal Revenue Code applies to the provisions of the Internal Revenue Code and the FAAA at issue in this case, the plaintiff's argument fails. The plaintiff ignores the fact that Jerry Anderson—who is not a member of the Hartry family—acquired 15 percent of outstanding MWW shares as a result of the 2012 share transfer. *See* Am. Compl. ¶ 20. Thus, even treating the Hartry family as a single shareholder, MWW failed to notify the TTB of "a change in the identity of the principal stockholders exercising actual or legal control of the operations of the corporation." 27 C.F.R. § 44.107; *see also* 27 U.S.C. § 204(g) (noting that a basic alcohol permit automatically terminates "if transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person").[6] The facts in the plaintiff's complaint show that a transfer of actual of legal control occurred by virtue of this stock transfer, which transfer was not properly reported to the TTB.[7]

---

[6] The defendants also argue that, by failing to report the stock ownership changes to the TTB, MWW ignored the plain text of the permits. The Tobacco Permit requires MWW to notify the TTB of "[a]ny change in name, address, ownership, or control," Tobacco Permit at 1, while the Alcohol Permits require MWW to alert the TTB to "any change in stock ownership (more than 10%)" and "any change in proprietorship or control of the business," Alcohol Permits at 1–2 (capitalization omitted). Thus, in addition to subjecting the plaintiff's permits to automatic termination under 27 C.F.R. § 44.107 and 27 U.S.C. § 204(g), the failure to report a change in "actual or legal control" could constitute a "willful[ ] violat[ion]" of the terms and conditions of the permits, which violation subjects the permits to revocation or suspension. 27 U.S.C. § 204(e); *see also* 27 C.F.R. § 44.162.

[7] The plaintiff also asserts that determining whether a change in actual or legal control occurred "would require TTB to conduct an examination of laws and corporate documents unique to the corporate entity, which determine how 'control' of the entity and its operations is exercised." Pl.'s Opp'n at 9. No such inquiry is required in this case. In *Gulf Coast*, prior to the unreported change in actual or legal ownership, the plaintiff's shares were owned 45 percent by Mr. Geller, 45 percent by Ms. Geller, and 10 percent by their son, Jay Geller. *Gulf Coast I*, 218 F. Supp. 3d at 95. After Mr. Geller's death, Ms. Geller inherited her husband's shares, leaving the ownership 90 percent by Ms. Geller and 10 percent by Jay Geller. *Id.* This unreported transfer gave rise to the *Gulf Coast* litigation, including the D.C. Circuit's acknowledgment that Gulf Coast's permits had terminated by virtue of this unreported transfer. *Gulf Coast II*, 867 F.3d at 125. Transfers of similar sizes were made in this case. The face of the plaintiff's complaint indicates that the December 2012 stock transfer resulted in a reduction in Robert L. Hartry's control from 80.4 percent to 45.4 percent and added Jerry Anderson as a new owner. Am. Compl. ¶¶ 18, 20. No examination of MWW's corporate documents is needed to conclude that a transfer resulting in a majority shareholder becoming a minority shareholder and in the addition of an entirely new owner is a change in "actual or legal control" of the corporation.

## C.     The Plaintiff Failed to Properly Serve the U.S. Attorney

Finally, the defendants argue that the amended complaint should be dismissed because the plaintiff failed to properly serve the United States Attorney.  Federal Rule of Civil Procedure 4(i)(1) specifies that to properly serve the United States, a party must "deliver a copy of the summons and of the complaint to the United States attorney for the district where the action is brought" or "send a copy of each by registered or certified mail to the civil-process clerk at the United States attorney's office."  FED. R. CIV. P. 4(i)(1)(A)(i)–(ii).  The Advisory Committee Notes to this rule clarify that, "[t]o assure proper handling of mail in the United States attorney's office, the authorized mail service must be specifically addressed to the civil process clerk of the office of the United States attorney."  FED. R. CIV. P. 4(i), Advisory Committee Notes to 1993 Amendment.

In this case, the defendants challenge the service of process on the United States Attorney.[8]  The plaintiff's proof of service filed in response to the first Order to Show Cause indicates that certified mail was delivered to "USA c/o Ronald C. Machen, Jr., Esq. US Attorney" on June 12, 2017.  Pl.'s First OSC Resp. at 9.  The complaint was filed on June 30, 2017, eighteen days after this purported service was made.  In addition, the mail was not properly addressed to the civil-process clerk of the United States Attorney's office as required by Rule 4(i).  The plaintiff's proof of service for the amended complaint was directed to the same addressee.  Pl.'s Second OSC Resp. at 7.  The plaintiff offers no explanation for the discrepancy in dates for the first proof of service and does not acknowledge the incorrect addressee, arguing instead that "[d]efendant acknowledges receipt of such service, has appeared her [sic] and has filed its response to its pleading."  Pl.'s Opp'n at 14.  The defendants timely challenged the sufficiency of this service as required by Rule 12(b), however, by raising it in a motion prior to

---

[8]     The defendants do not allege that the Attorney General was improperly served and, accordingly, have waived such argument.  *See Mann*, 681 F.3d at 373; FED. R. CIV. P. 12(h).

any responsive pleading. Thus, the fact that the defendants acknowledged the complaint and filed a motion to dismiss challenging service does not waive their argument that service upon the United States Attorney was insufficient.

## IV.      CONCLUSION

For the foregoing reasons, the Court lacks subject-matter jurisdiction over the plaintiff's claims. Accordingly, the defendants' Motion to Dismiss, ECF No. 14, is granted. An appropriate Order accompanies this Memorandum Opinion.

Date: May 15, 2018

_____
BERYL A. HOWELL
Chief Judge